UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICKY GONZALEZ,

Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF CORRECTIONS, CORRECTIONAL OFFICER JOHN JUNE *Shield No. 18179*, CORRECTIONAL OFFICER JOHN RANDAZZO *Kitchen*, CORRECTIONAL OFFICER JANE JOHNSON *Law Library*, CORRECTIONAL OFFICER JANE DIAZ *Grievance*, DEPUTY WARDEN JOHN CHESTER, CAPTAIN JANE PIERRE, JANE DOE *NURSE/CLINICIAN*, and CITY OF NEW YORK

Defendants.

Case No. 1:24-cv-03859 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Ricky Gonzalez ("Plaintiff" or "Gonzalez"), a former pretrial detainee at Rikers Island, brings a claim under 42 U.S.C. § 1983 against Defendant Correction Officer John June ("Defendant" or "June"), and others, alleging that June used excessive force when he twice deployed oleoresin capsicum ("OC") spray against Gonzalez on May 17, 2021. Now before the Court is June's motion for judgment on the pleadings under Federal Rule of Civil Procedure ("Rule") 12(c). Dkt. 50 ("Mot."). For the reasons that follow, the motion is GRANTED.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the Complaint and taken as true for purposes of the motion. *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 952 (2d Cir. 2024).[1] At the time of the events at issue, Gonzalez was detained at the Robert N. Davoren Center on Rikers Island. Dkt. 1 ("Compl." or the "Complaint") at 11. On the evening of May 17, 2021, Gonzalez alleges that he was walking to the medical clinic to receive medication when June sprayed him in the "face, mouth, and eyes" with OC spray. *Id.* at 8. Gonzalez characterizes the encounter as "unprovoked and non-violent on [his] part," alleges that he had "no weapons or contraband," and claims that his "hands were up as officer June continued spraying." *Id.* Gonzalez further alleges that he was taken to a shower for decontamination and that, following the incident, his vision has become "blurred and spotty." *Id.* at 8-9.

The Complaint also repeatedly refers to surveillance footage of the encounter. Specifically, Gonzalez alleges that "[t]he unnecessary use of force by officer June was recorded by the cameras between Modular 4 dormitory bridge area and corridor 4," *id.* at 8, and elsewhere refers to "recorded video footage of the incident," *id.* at 9. The Department of Correction's surveillance footage from those cameras was submitted with June's motion. *See* Dkt. 51-1 ("Futral Decl."), Ex. C ("RNDC-17 Footage"); *id.*, Ex. D ("RNDC-12 Footage"); *id.*, Ex. E ("RNDC-15 Footage") (collectively, the "Videos"). The Videos contain no audio.

The Videos provide additional visual context. They show Gonzalez walking through a corridor while several correction officers move toward him and attempt to redirect him and block him from progressing forward. *See* RNDC-12 at 18:42:47-18:43:26; RNDC-15 at 18:43:11-

[1] For the reasons discussed below, *see infra* Section I, the Court also relies on the video footage submitted along with June's motion.

18:43:26. Gonzalez does not stop. Instead, he changes direction and maneuvers around the officers, at points weaving from one side of the corridor to the other, while continuing to try to proceed down the hallway past the officers. *See* RNDC-12 at 18:42:47-18:43:26; RNDC-15 at 18:43:11-18:43:26. Because the Videos contain no audio, they do not establish what, if anything, the officers said to Gonzalez during this interaction.

At approximately 6:43 p.m., June directs a one-second burst of OC spray at Gonzalez. *See* RNDC-12 at 18:43:27-18:43:28; RNDC-15 at 18:43:27-18:43:28. In response, Gonzalez turns his head away from the officers, but within seconds he again continues moving forward in their direction. *See* RNDC-12 at 18:43:29-18:43:32; RNDC-15 at 18:43:28-18:43:32. June then deploys a second one-second burst of OC spray. *See* RNDC-12 at 18:43:32-18:43:33; RNDC-15 at 18:43:32-18:43:33. Gonzalez wipes his eyes, turns around, and shortly thereafter stops trying to move past the officers and permits them to handcuff him and escort him out of the hallway. *See* RNDC-12 at 18:43:34-18:47:45; RNDC-15 at 18:43:34-18:48:06. He was later taken to the showers for decontamination. *See* Compl. at 8.

Nothing in the Videos shows Gonzalez striking an officer, brandishing a weapon, or making an overtly threatening gesture. At the same time, the footage makes clear that several officers are attempting to prevent Gonzalez from continuing through the corridor and that Gonzalez is intent on continuing forward despite the officers' efforts.

## II. Procedural History

On May 16, 2024, Gonzalez, then proceeding *pro se*, commenced this action. *See* Compl. The Complaint asserted several claims arising from Gonzalez's detention at Rikers Island, as well as claims concerning his criminal proceedings and his later incarceration at Auburn Correctional Facility ("Auburn"). *See generally id.* On November 14, 2024, the Court

dismissed the claims concerning Gonzalez's criminal proceedings and Auburn, leaving the Rikers Island claims pending. *See* Dkt. 8.

On March 10, 2025, the Court dismissed the New York City Department of Correction as a non-suable entity, construed the Complaint as asserting claims against the City of New York, and dismissed without prejudice Gonzalez's claims against Correction Officer Jane Diaz and Nurse Jane Doe. *See* Dkt. 11. Gonzalez thereafter moved to replead his claims against Diaz and Doe, *see* Dkt. 25, and the Court granted that request on June 11, 2025, *see* Dkt. 28. The remaining Defendants answered on September 15, 2025. *See* Dkt. 36 ("Answer").

On December 15, 2025, June moved under Rule 12(c) for judgment on the pleadings as to the excessive force claim against him. *See* Mot.; Dkt. 51 ("Br."). June submitted the Videos with his supporting declaration. *See* Futral Decl., Exs. C-E. After Gonzalez requested assistance of counsel, *see* Dkt. 55, the Court sought *pro bono* counsel for the limited purpose of assisting Gonzalez in opposing the motion, *see* Dkt. 60. *Pro bono* counsel appeared on March 18, 2026, *see* Dkts. 64-65, and filed Gonzalez's opposition on May 19, 2026, *see* Dkt. 71 ("Opp."). June replied on June 18, 2026. *See* Dkt. 72 ("Reply"). The motion is thus fully briefed.

## LEGAL STANDARD

Under Rule 12(c), "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "'Pleadings' include both the 'complaint' and the 'answer to the complaint.'" *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (alteration adopted) (quoting Fed. R. Civ. P. 7(a)).

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (alteration adopted) (quoting *Patel v. Contemp. Classics*, 259 F.3d 123, 126 (2d Cir. 2001)). The "[C]ourt must assume the truth of all facts alleged in the

nonmovant's pleading and draw all reasonable inferences in the non-movant's favor." *Hartford Fire Ins. Co. v. W. Union Co.*, 630 F. Supp. 3d 431, 433 (S.D.N.Y. 2022); *see Lively*, 6 F.4th at 301. "To survive a motion for judgment on the pleadings, a [pleading] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[.]" *Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) (quotation marks and citation omitted). "Judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." *Lively*, 6 F.4th at 301 (alteration adopted) (citation omitted).

"On a [Rule] 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)). "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted).

## DISCUSSION

### I. Consideration of the Surveillance Footage

The Court first addresses the threshold question of what materials it may consider in resolving the present motion. June asks the Court to consider the Videos without converting the motion into one for summary judgment because, in his view, Gonzalez incorporated the Videos by reference in the Complaint and also made them integral to his claim. Br. at 4-5; Reply at 1-3. Gonzalez responds that he had not seen or possessed the Videos when he filed the Complaint and merely noted their existence therein, so the Videos cannot be deemed integral to or incorporated

by reference in the Complaint. Opp. at 5-8. The Court agrees with June that the Videos are incorporated by reference.

A complaint incorporates material by reference when it "make[s] a clear, definite and substantial reference to the [material]." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (collecting cases); *see also Sira*, 380 F.3d at 67 (deeming materials incorporated by reference where the complaint "explicitly refer[red] to and relie[d] upon" them). Courts in this Circuit have applied that rule to video footage at the pleading stage when the complaint specifically refers to the footage. *See, e.g.*, *Norales v. Acevedo,* No. 21-549, 2022 WL 17958450, at *2 (2d Cir. Dec. 27, 2022) (summary order) (concluding that district court properly considered video as "integral to the complaint" where "[k]ey allegations in the complaint rested on the content of the surveillance video"); *Alba v. City of New York*, No. 23-cv-08619 (LAK), 2025 WL 26771, at *1 (S.D.N.Y. Jan. 3, 2025) (finding that "the magistrate judge properly considered [store] videos of the incident at the center of the suit" because the first amended complaint "explicitly refer[red] to and relie[d] upon the store videos to support its . . . claims"); *Mercado v. City of New York*, No. 22-cv-09462 (NRB), 2024 WL 3185963, at *1 n.3 (S.D.N.Y. June 26, 2024) (considering police body worn camera footage "[b]ecause the body worn camera footage was specifically referenced by the plaintiffs in their operative complaint and depict[ed] the very events complained-of in the amended complaint"); *Cook v. Dubois*, No. 19-cv-08317 (CS), 2021 WL 91293, at *2 (S.D.N.Y. Jan. 11, 2021) ("The prison's security cameras recorded the altercation in its entirety, and the footage is incorporated by reference in [p]laintiff's [a]mended [c]omplaint by several instances where the [a]mended [c]omplaint states that [p]laintiff's allegations are confirmed by the video."); *Manzi v. Goldfine*, No. 23-cv-05176 (PMH), 2024 WL 2943876, at *4 (S.D.N.Y. June 10, 2024) (treating body

worn camera footage as incorporated by reference because the complaint twice referenced the footage); *Hill v. City of New York*, No. 25-cv-00911 (OEM) (CHK), 2026 WL 1847098, at *3 (E.D.N.Y. June 26, 2026) (same).

*Manzi* and *Hill* are especially instructive. In both, the complaint expressly referred to body worn camera footage and relied on what the footage purportedly showed to support the plaintiff's claims. *See Manzi*, 2024 WL 2943876, at *4 (citing allegations that "[t]he body cam footage shows clearly that [nonparty] was the aggressor" and "the body camera footage . . . clearly contradicted the witness' statement and allegation" (alteration adopted) (citations omitted)); *Hill*, 2026 WL 1847098, at *3 (relying on allegations that the incident "was recorded on [officer's] body camera" and that "[t]here is video proof of this interaction" (citations omitted)). So too here. Contrary to his argument in his opposition brief, Opp. at 6, Gonzalez did more than allege that the footage happened to exist. He identified particular cameras, alleged that they recorded the challenged use of force, and invoked the resulting footage as corroboration of his account. *See* Compl. at 8 ("The unnecessary use of force by officer June was recorded by the cameras between Modular 4 dormitory bridge area and corridor 4."); *id.* at 9 (noting efforts to obtain the "recorded video footage of the incident" to corroborate his allegations). Those allegations sufficiently reference the Videos to permit their incorporation into the Complaint. The Court may therefore consider the Videos without converting the motion under Rule 12(d). *See Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 277 (S.D.N.Y. 2008) ("Although the [c]ourt is limited to facts as stated in the complaint, it may consider exhibits or documents incorporated by reference without converting the motion into one for summary judgment." (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995))).

Importantly, that conclusion determines only whether the Court may consider the Videos; it does not require the Court to adopt June's characterization of everything they depict. "[W]hen the record includes a video that the parties concede is authentic and accurate, as is the case here,"[2] the Court "view[s] the allegations of the complaint as true only 'to the extent that they are not contradicted by video evidence.'" *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Garcia v. Does*, 779 F.3d 84, 88 (2d Cir. 2015)). Where the footage permits competing reasonable interpretations, the ordinary Rule 12(c) requirement to draw reasonable inferences for the nonmovant continues to apply. *See Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 550 (S.D.N.Y. 2016) ("If a fact is susceptible to two or more competing inferences . . . the [c]ourt must, as a matter of law, draw the inference that favors the [nonmovant] so long as it is reasonable." (citing *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013))).

Here, the Videos establish that several officers attempted to prevent Gonzalez from proceeding through the corridor, that Gonzalez actively maneuvered around them and continued trying to proceed, that he continued moving toward the officers after the first burst of OC spray, and that he stopped after the second. *See generally* RNDC-12; RNDC-15. The Videos do not establish what commands or warnings were given, because they contain no audio. Nor do they plainly show Gonzalez striking an officer or otherwise posing an immediate physical threat. *See generally* RNDC-12; RNDC-15. The Court proceeds on that factual record.

---

[2] "Where the parties dispute the authenticity, accuracy, or completeness of a video in portraying relevant events, it may not be a basis for disregarding the truth of allegations in a complaint." *Alba*, 2025 WL 26771, at *2. That is not the case here. Gonzalez does not contest the accuracy or completeness of the Videos, *see generally* Opp.; he argues only that they cannot be considered at this stage — an argument that the Court rejects for the reasons described above.

## II. Qualified Immunity

June contends that he is entitled to qualified immunity on Gonzalez's excessive force claim. *See* Br. at 7-10. "Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law." *Zorn v. Linton*, 607 U.S. 568, 571 (2026). "The Supreme Court has articulated, and th[e] [Second Circuit] has adopted, a two-step analysis to determine whether qualified immunity bars a plaintiff's claim." *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019). Pursuant to this analysis, a claim may overcome the shield of qualified immunity only where "a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The parties dispute both prongs. June argues that no constitutional violation occurred because his limited use of OC spray was objectively reasonable in response to Gonzalez's noncompliance and continued advance, Br. at 5-7; Reply at 6-7, and that, in any event, no clearly established law prohibited such force under materially similar circumstances, Br. at 9-10; Reply at 7-10. Gonzalez responds that the Complaint plausibly alleges unnecessary and disproportionate force against a nonthreatening detainee, Opp. at 9-14, and that by May 2021 it was clearly established that officers could not gratuitously use chemical agents against detainees who posed no immediate threat, *id.* at 15-18. The Court addresses each prong in turn.

### A. Constitutional Violation

Because Gonzalez was a pretrial detainee, *see* Opp. at 1, his excessive force claim arises under the Due Process Clause of the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." (citation omitted)). To state an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against

him was objectively unreasonable." *Id.* at 396-97. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must determine what is objectively reasonable "from the perspective of a reasonable officer on the scene," taking into account "the legitimate interests that stem from the government's need to manage the facility in which the individual is detained" and the "'policies and practices that in the judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (alterations adopted) (first quoting *Graham*, 490 U.S. at 396; and then quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)); *see id.* at 399-400; *accord Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020). Other relevant factors include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

The parties' opposing interpretations of the Videos illustrate why the constitutional question is a close one. On one hand, the Videos undermine any suggestion that June sprayed Gonzalez while Gonzalez was standing still or otherwise submitting to the officers. Gonzalez was unrestrained, several officers were plainly trying to stop him from walking down the corridor, and Gonzalez repeatedly maneuvered around them in an effort to continue down the corridor. *See* RNDC-12 at 18:42:47-18:43:26; RNDC-15 at 18:43:11-18:43:26. Even after the first burst of OC spray, he resumed moving forward before June used the second burst. *See* RNDC-12 at 18:43:29-18:43:32; RNDC-15 at 18:43:28-18:43:32. Those facts could support a legitimate need to obtain control of Gonzalez. *See, e.g.*, *Stinson v. City of New York*, No. 18-cv-

00027 (LAK) (BCM), 2021 WL 3438284, at *13-14 (S.D.N.Y. July 6, 2021) (finding that "deliver[y of] two short bursts of chemical spray towards" plaintiff-detainee who was resisting efforts to take her to a holding cell did not amount to excessive force); *Beauvoir v. Falco*, 345 F. Supp. 3d 350, 369 (S.D.N.Y. 2018) (concluding that while "use of . . . pepper spray may not have been strictly necessary, as [p]laintiff was not behaving belligerently or threateningly, . . . it was permissible in the context of needing to maintain a baseline of order in the prison system" because "[p]laintiff repeatedly resisted multiple officers' orders").

On the other hand, "[t]he use of pepper spray 'constitutes a significant degree of force,' and can amount to an excessive use of force." *Berry v. City of New York Dep't of Corr.*, No. 12-cv-07819 (RWS), 2014 WL 2158518, at *5 (S.D.N.Y. May 22, 2014) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010)), *aff'd*, 622 F. App'x 10 (2d Cir. 2015) (summary order). The Videos do not show Gonzalez assaulting anyone, displaying a weapon, or making an overtly threatening gesture. *See generally* RNDC-12; RNDC-15; RNDC-17. The lack of audio also prevents the Court from determining whether officers gave Gonzalez verbal commands or warnings before June used OC spray. And Gonzalez alleges continuing vision problems after the encounter. *See* Compl. at 9; *see also* Opp. at 3. Those considerations weigh against treating the use of force as plainly reasonable as a matter of law. *See Tracy*, 623 F.3d at 98 ("[P]epper spray . . . should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer."); *Urena v. City of New York*, No. 22-cv-04679 (RA), 2024 WL 4149182, at *4 (S.D.N.Y. Sept. 10, 2024) ("Given the variety of incapacitating and painful effects that pepper spray produces, courts must carefully consider whether a detainee is actively resisting or poses a threat to the safety of officers or others when the officer deploys such force." (quotation marks and citations omitted));

*cf. Walton v. Lee*, No. 15-cv-03080 (PGG), 2019 WL 1437912, at *6 (S.D.N.Y. Mar. 29, 2019) ("The use of pepper spray is not an actionable constitutional violation where there is no lasting injury, and where the subject was not cooperating with law enforcement.").

The Court need not, however, resolve that constitutional question to decide the motion. The Supreme Court has "held that courts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)); *accord Pearson*, 555 U.S. at 236. Because the clearly established law inquiry resolves the motion, *see infra* Section II.B, the Court declines to resolve the objective reasonableness of June's use of OC spray under *Kingsley*.

**B. Clearly Established Law**

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle*, 566 U.S. at 664; *accord Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Brown*, 862 F.3d at 190 (alteration adopted) (citation omitted); *accord Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam). While there need not be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. For this reason, the Supreme Court has oft "reiterate[d] the longstanding principle that clearly established law should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quotation marks and citation omitted). Rather, courts generally must identify precedent involving "an officer acting under similar circumstances," and "[t]he

relevant precedent must define the right with a 'high degree of specificity.'" *Zorn*, 607 U.S. at 572 (first quoting *Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam); and then quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "In short," the question is whether an "officer[] . . . could have read the relevant precedent before[ acting] and known that it proscribed their specific conduct." *Id.* (alteration adopted) (quotation marks and citation omitted).

The Court is mindful that qualified immunity is more difficult to resolve on the pleadings than on summary judgment. *See Verley v. Goord*, No. 02-cv-01182 (PKC) (DF), 2004 WL 526740, at *17 (S.D.N.Y. Jan. 23, 2004) ("A qualified immunity defense . . . is typically addressed at the summary judgment stage because it usually depends on the facts of the case, making dismissal at the pleading stage generally inappropriate."). When the defense is raised at this stage, "the facts supporting the defense must appear on the face of the complaint, or in its attachments and documents incorporated by reference," and the nonmovant is "entitled to all reasonable inferences from the facts alleged, not only those that support their claim, but also those that defeat the immunity defense." *Sabir v. Williams*, 52 F.4th 51, 63-64 (2d Cir. 2022) (alterations adopted) (quotation marks and citations omitted); *accord Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020). For that reason, a pleading-stage qualified immunity defense "faces a formidable hurdle." *Chamberlain*, 960 F.3d at 111 (citation omitted). At the same time, qualified immunity should be resolved "at the earliest possible stage in litigation" when the relevant facts are established by the pleadings and incorporated materials. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see, e.g.*, *Kass*, 864 F.3d at 206 ("revers[ing] the district court's denial of [defendant-]officers' motion for judgment on the pleadings with respect to [plaintiff]'s federal false arrest and imprisonment claim" on qualified immunity grounds).

With those principles in mind, the Court frames the relevant right based only on facts favorable to Gonzalez that are consistent with the Videos. The Court assumes that Gonzalez was unarmed, nonviolent, and did not pose an immediate physical threat; it does not assume that officers gave him any verbal command or warning. The Videos nevertheless establish that Gonzalez was unrestrained and walking down a corridor, that several officers were physically attempting to stop his forward movement, that he actively maneuvered around the officers to continue through the corridor, and that he continued trying to proceed toward the officers and down the corridor after the first burst of OC spray. The relevant question is therefore whether, by May 17, 2021, *see* Compl. at 8, controlling precedent clearly established that an officer could not use two brief bursts of OC spray in those circumstances.

Contrary to Gonzalez's argument, Opp. at 17, *Tracy v. Freshwater* does not clearly establish that rule. There, the Second Circuit held that a reasonable jury could find excessive force where an officer sprayed an arrestee "already in handcuffs and offering no further active resistance." 623 F.3d at 98. The court further observed that "no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Id.* at 99 n.5. Gonzalez was neither restrained nor unresisting when June used either burst. *See* RNDC-12 at 18:43:27-18:43:28 (first burst), 18:43:32-18:43:33 (second burst); RNDC-15 at 18:43:27-18:43:28 (first burst), 18:43:32-18:43:33 (second burst). *Tracy* therefore establishes an important limit on the use of pepper spray, but not the more specific rule Gonzalez needs here.

Indeed, *Brown v. City of New York*, 862 F.3d 182 (2d Cir. 2017) points in the opposite direction. There, officers "repeated[ly] use[d] pepper spray," "kick[ed] . . . [the arrestee-plaintiff's] legs out from under her to bring her to the ground," and "push[ed] [her] face onto the

pavement . . . after [she] refused to comply with the instructions to place her hands behind her back for handcuffing." *Id.* at 190. Although the plaintiff was not threatening the officers, the Second Circuit held that qualified immunity applied because no Supreme Court or Second Circuit precedent clearly established that the officers' conduct was unlawful "in the particular circumstance presented." *Id.* It bears mention that *Brown* involved "warn[ings] prior to each application of the pepper spray," *id.*, which the present Videos cannot establish due to their lack of audio, but *Brown* is still significant binding authority showing that repeated pepper spray against a nonthreatening but actively noncompliant person is not categorically unlawful.

*Frost v. New York City Police Department*, 980 F.3d 231 (2d Cir. 2020) likewise underscores the distinction between force used while a detainee is resisting and force used after submission. As in this case, the Fourteenth Amendment governed Frost's excessive force claim. *See id.* at 251. The Second Circuit explained that a detainee's active resistance, which in Frost's case consisted of "holding [a] door shut with his arm" and "struggl[ing] with the officers as they tried to restrain him," permitted officers to use "nontrivial amounts of force," *id.* at 256, while continued force "after Frost was subdued" could present a different constitutional question, *id.* at 257. Here, the Videos show Gonzalez continuing to maneuver around the officers after the first burst and stopping only after the second, at which point June ceased using OC spray. *See* RNDC-12 at 18:43:29-18:47:45; RNDC-15 at 18:43:28-18:48:06. Thus, *Frost* did not put June on notice that the two brief applications of OC spray shown here were unconstitutional.

District court decisions available before May 2021 reinforce the absence of clearly established law. While district court decisions cannot themselves create such law, *see Richardson v. Selsky*, 5 F.3d 616, 623 (2d Cir. 1993), they may confirm that controlling precedent had not yet supplied the specific rule at the time the decision was rendered. Most

notably, *Ismael v. Charles* considered pepper spray used against an "unrestrained yet uncooperative inmate who was not physically threatening officers" and held that it was "not clearly established" that such use was unlawful. No. 18-cv-03597 (GHW), 2020 WL 4003291, at *11 (S.D.N.Y. July 15, 2020). Having been decided approximately ten months before the at-issue incident, *Ismael* supports the uncertainty that remained in factual scenarios akin to those here.

Gonzalez's other cited authorities do not resolve that uncertainty. For example, in *Wiggan v. New York City Department of Correction*, No. 12-cv-01405 (GBD) (HBP), 2014 U.S. Dist. LEXIS 117635 (S.D.N.Y. Aug. 21, 2014), *report and recommendation adopted*, 2014 WL 4631456 (S.D.N.Y. Sept. 16, 2014), the court denied qualified immunity at summary judgment where the officer "administered a thirty-second burst of pepper spray through the [plaintiff's] cell door" after the plaintiff, who was "locked in his cell," "disobeyed an order from [the officer]" and "engaged in an argument with [the officer] concerning the removal of an obstruction from the cell door." *Id.* at *26-27. As a threshold matter, because *Wiggan* is "a district court decision," it "does not 'clearly establish' the law, even in its own circuit." *Richardson*, 5 F.3d at 623. Moreover, *Wiggan* is inapt because, there, the plaintiff was already locked in his cell when the officer deployed a burst of pepper spray approximately thirty times longer than the bursts at issue here. 2014 U.S. Dist. LEXIS 117635, at *26-27. Similarly, *Thomas v. Byrd*, No. 08-cv-03840, 2009 WL 4546666 (E.D. Ark. Nov. 30, 2009), in addition to being an out-of-Circuit case,[3] involved chemical spray used against an inmate for dressing too slowly and refusing an order to drop a bar of soap. *Id.* at *9. *Thomas* is therefore distinguishable

---

[3] "There is some tension in th[e] [Second Circuit]'s case law concerning whether out-of-circuit precedent can ever clearly establish law in this Circuit." *Brown*, 862 F.3d at 191 (comparing *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006), with *Garcia*, 779 F.3d at 95 n.12).

because the Videos here establish active efforts by Gonzalez to move past and evade officers attempting to contain him. *See* RNDC-12 at 18:42:47-18:43:26; RNDC-15 at 18:43:11-18:43:26.

In sum, the law as of May 17, 2021, clearly prohibited use of significant force against a restrained, compliant, or no longer resisting person. It did not clearly establish that a correction officer could not use two brief bursts of OC spray against an unrestrained detainee who was nonviolent and not visibly threatening, but who actively maneuvered around several officers attempting to stop his movement down a corridor in a correctional facility and continued trying to proceed past the officers after the first burst. Gonzalez's broader formulation — that officers may not use chemical agents against a detainee who poses no immediate physical threat — defines the right at too high a level of generality under *Zorn* and the cases on which it relies.

Importantly, discovery would not alter the Court's conclusion. The Court has resolved every material ambiguity in the present record in Gonzalez's favor: it assumes no verbal warning or command, no weapon, no assault, and no immediate physical threat. Those assumptions still do not yield a pre–May 2021 Supreme Court or Second Circuit decision holding materially similar conduct unconstitutional. Because the deficiency is one of clearly established law rather than an unresolved factual premise, June is entitled to qualified immunity at this stage. The Court therefore grants the motion without reaching whether June's conduct was objectively unreasonable under *Kingsley*.

## CONCLUSION

For the foregoing reasons, Defendant June's motion for judgment on the pleadings is GRANTED. Plaintiff's excessive force claim against June is dismissed, and the Clerk of Court

is respectfully directed to terminate the motion at Dkt. 50 and terminate John June as a defendant.

Plaintiff's remaining claims against the other Defendants are unaffected by this Opinion and Order.

Dated: September 28, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge